NOT DESIGNATED FOR PUBLICATION

No. 125,235

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of
N.W., R.W., and A.W.,
Minor Children.

MEMORANDUM OPINION

Appeal from Franklin District Court; ERIC W. GODDERZ, judge. Opinion filed February 10, 2023.
Affirmed.

*Kathryn S. Polsley*, of Ottawa, for appellant natural father.

*Kimberly Robinson*, deputy county attorney, and *Brandon L. Jones*, county attorney, for appellee.

Before ISHERWOOD, P.J., ATCHESON, J., and TIMOTHY G. LAHEY, S.J.

PER CURIAM:  The district court terminated Father's parental rights after hearing testimony that Father's oldest child, N.W., repeatedly sexually abused Father's younger children, A.W. and R.W., in the home and Father was aware of the abuse but chose not to intervene. The court's termination order relied on several statutory factors including that Father failed to complete a reintegration plan and Father's conduct was abusive in nature. Father appeals to this court and asserts the district court erred in finding he was unfit. He specifically argues that reasonable efforts were not undertaken to implement family therapy and that he completed nearly all his assigned reintegration tasks. Having scrutinized the record, we are satisfied it supports the conclusions reached by the district court and affirm its decision.

FACTUAL AND PROCEDURAL BACKGROUND

On March 18, 2022, the District Court of Franklin County terminated Mother's and Father's parental rights over their children, N.W., R.W., and A.W. While the rights of both parents were terminated, Mother is not a party to this appeal.

The case began in January 2021 when the Department for Children and Families (DCF) opened a case to investigate allegations that Mother subjected R.W. to physical and emotional abuse. As part of that inquiry, Jessica Drury, a DCF Child Protection Specialist, met with all three children at school. N.W. told Drury he would not allow his sisters to speak with her unless she met with all three of them together. Drury agreed and as the children entered the conference room, N.W. pulled A.W. aside and told her "[d]on't tell them about . . . ." N.W. did not complete the sentence out loud, seemingly because the sisters understood what issue he intended for them to avoid.

N.W. told Drury he did not like his home because it was gross, dirty, and they did not have much food. He described Father hitting him and his sisters with a studded belt when they got in trouble. N.W. did not allow the other children to speak, but after releasing the children as a whole Drury managed to meet with A.W. individually. A.W. explained that R.W. witnessed N.W. touching A.W.'s private parts in N.W.'s bedroom. A.W. said it happened often and her parents knew about the sexual contact. She also told Drury she did not feel safe at home and did not want to continue living there. Drury promptly shared the information with her supervisor and contacted law enforcement which led to a forensic interview with A.W. a few days later. The account A.W. provided for the investigators about N.W.'s behavior paralleled what she disclosed to Drury.

R.W. also participated in an individual interview with Drury. And while she worried about the prospect of sending N.W. to prison, she still divulged that N.W. "messe[d] with" A.W. "all the time" and that the entire house was aware of the behavior.

R.W. explained that anytime N.W.'s door was closed and N.W. and A.W. were missing, she knew "that they were doing it." She told her Mother but her Mother simply told R.W. to be quiet. R.W. also participated in a forensic interview and provided a similar account.

These discussions prompted DCF to expand the case to allege sexual abuse between N.W. and his sisters. The agency already had a pending case for the family based on allegations of physical abuse. Drury and a child protective investigator informed the parents of the new allegations, but both denied any awareness of the sexual activity and passed it off as simply another lie told by R.W.

Drury testified that the statements from R.W. and A.W., as well as other details uncovered during the investigation, resulted in the children's removal from the home. In making the decision to do so, Drury was also mindful of two previous DCF cases for the family, although unsubstantiated, involving incidents of sexual abuse that allegedly occurred in the home. One from December 2015 claimed N.W. engaged in acts of inappropriate sexual conduct, and another from March 2017 which alleged that Father perpetrated sexual abuse against one of the children and provided N.W. with pornography.

On January 26, 2021, the State filed child in need of care (CINC) petitions for each child and the court ordered their placement in protective custody. A.W. and R.W. remained together, but N.W. was placed in a different home. Two months later the court adjudicated all three as CINC because they lacked adequate parental care, control, or subsistence and that condition was not due solely to lack of financial means of the child's parents or other custodian; the children were without the care or control necessary for their physical, mental, or emotional health; and the children had been physically, mentally, or emotionally abused or neglected, or sexually abused. See K.S.A. 38-2202(d)(1)-(3).

The court initially ordered dual goals of reintegration and adoption. Several months later, however, it held a permanency hearing and upon its conclusion, determined reintegration was no longer a viable option. The goal then shifted to adoption or permanent custodianship and the court ordered the State to file a motion to terminate the parental rights of both parents.

The State followed the court's order, and a hearing was held on the matter over the course of two days. The State called Drury as its first witness, and she offered testimony concerning her involvement in the investigation. Three DCF case managers who oversaw the children's case were also called to testify. Gabrielle Walker managed the case from January 2021 until July 2021, Jamie Payne took over that summer and managed the case until October 2021, and Rebecca White managed the case from November 2021 until the termination hearing.

Walker testified and explained that she met with Mother and Father in late January or early February 2021 to develop a case plan, but her efforts were stymied because the parents did not believe the allegations were true. Though a formal plan was not developed, Walker still assigned several tasks the parents were expected to complete to secure reintegration. One of those tasks required the parents to obtain a mental health referral to determine whether they needed therapeutic services. The court heard testimony that the parents took no independent action and rejected recommendations from the agency for three possible counselors as too expensive, unavailable to new clients, or because they disliked the therapist. Despite a significant delay, both parents eventually completed a mental health intake.

The State also called Bryan Richardson as a witness. Richardson was the therapist responsible for completing Father's intake and testified that Father seemed frustrated at the overall process, denied the abuse occurred, and told Richardson he did not need therapy. Following their session, Richardson did not recommend further treatment

because given Father's rejection of the abuse allegations, he did not exhibit any symptoms that met the clinical criteria for diagnosis.

The State also presented testimony from the children's therapists. Jennifer Corbin-Daulton was the first to provide counseling services for N.W. and testified that he discussed sexual intercourse with his siblings and mentioned participation by another male peer. Corbin-Daulton asserted that N.W. seemed ashamed and stated that his parents spanked him when he got caught having sex with his sister. He also recalled seeing Father watching pornography on television and then sneaking off to watch it by himself.

Corbin-Daulton explained that if the parents refused to accept the fact the abuse occurred it reduced the likelihood of success for family therapy. She told N.W.'s caseworker that she was concerned about N.W. being around children younger than him, and what she feared ultimately came to pass as N.W. was accused of sexual contact with an unrelated five-year-old during the course of the case.

Donya Anderson testified that she started working with N.W. as a patient in November 2021. N.W. shared that he was ashamed and felt guilty about his behavior and based on his sunken posture, Anderson believed the assertions to be true. When asked why he was removed from his parents' home, N.W. explained that he frequently had sex with his sisters and was physically abused. He told Anderson that his parents were aware of the sexual activity and one time, Father came into his room, pulled back the blankets, and saw the children having sex. In response, Father simply spanked the children. Based on their conversation, Anderson gleaned that the sexual activity between the siblings spanned roughly a 10-month period.

N.W. also disclosed that he would see Father watching pornography on television and then N.W. would find pornography on a tablet and watch it by himself before "teaching" it to his sisters. He used words like penis, vagina, and penetration, which

Anderson testified were not common words for a child of his age to know. N.W. also told Anderson that he did not want to live with his parents because he did not want to be hit anymore.

Finally, Amie Mueller testified about her individual therapy sessions with A.W. and R.W. She explained that both girls were developmentally delayed and A.W. suffered from several behavioral issues, including defiance. During a session A.W. used dolls to illustrate the vaginal and oral sex perpetrated by N.W. and recalled experiencing pain and bleeding as a result of the acts. A.W. shared with Mueller that she told her parents but they simply told her to hush. Mueller testified that A.W. described the incidents without the normal reticence shown by children which suggested that A.W. believed sexual abuse was a normal part of life.

R.W. disclosed to Mueller that N.W. had sexual intercourse with her and their sister and that a neighbor boy also participated sometimes. She explained that N.W. did it with A.W. frequently and she told her parents what was going on but, like A.W., was just told to hush. R.W. told Mueller she feared reintegration because she believed the sex acts would resume and her parents would still do nothing to stop it.

Both girls suggested they had seen pornography and knew Father and N.W. watched it. Finally, both girls consistently stated they neither wanted to visit nor live with Father and Mother.

The children shared weekly supervised visits with their parents for two months following their removal from the home. Walker testified the visits did not go well and R.W. sat by her during visits rather than talk with her parents. R.W. also told Walker that her parents did not like her and only talked to her siblings. Walker also testified that A.W. cried during visits, sometimes because they were ending but other times "out of

6

fear and concerns of not knowing what was really going on." Walker corroborated that the parents largely only seemed interested in speaking with N.W.

In response, group visits ceased and coordinated times for the parents to meet with the girls separately from their visit with N.W. were established instead. At the parent's first visit with just the girls, A.W. told Mother that she always used to say A.W. was mean and stupid. R.W. confirmed this assertion, but Mother claimed it was untrue. During this same visit, R.W. told her parents they were scary. Ultimately, the decision was made to move the visits to a more therapeutic setting because N.W. and the parents were "code talking" during their visits and the parents struggled to communicate with the girls in a meaningful way.

Mueller, the girls' therapist, did not support the option of therapeutic visits because of the parents' persistent refusal to acknowledge the abuse occurred, and she made her position known to the caseworker. Mueller explained that such visits necessitated a discussion where the parents recognized what happened and shared a conversation with the children about how things would be different in the future. The goal, Mueller testified, was to make the children feel safe but without the parents' acknowledgment of the abuse, there was no space for that dialogue to occur.

Corbin-Daulton, N.W.'s first therapist, testified that she supported a family therapeutic visit. But Anderson, N.W.'s second therapist, took the opposing view. Anderson testified it would cause her concern if the parents were not in mental health treatment or continued to deny that the abuse occurred. Family visits were discontinued after March 2021 based on recommendations from the children's therapists.

Neither parent testified nor called witnesses. After hearing arguments from the parties, the court terminated the parental rights of Mother and Father and outlined the specific factors that provided the foundation for its decision. It also expressed concern

that the parents took months to complete a mental health intake and when they finally did so they denied the abuse allegations. The court then found the facts supported the allegations that N.W. repeatedly sexually abused his sisters, the parents were aware of the abuse, and their failure to act was "unthinkable." It stated that but for the intervention by the State the abuse likely would have continued.

As for therapeutic family counseling, the court explained it was not an option because, again, the parents refused to acknowledge the abuse. The court also noted their actions were abusive and possibly could have resulted in criminal charges given their refusal to take any steps to stop the sexual conduct once they learned about it.

The court determined that reasonable efforts carried out by private agencies to try to rehabilitate the family ultimately failed and the parents likewise failed when they refused to adjust their circumstances to meet the needs of the children. Finally, it concluded that both parents were unfit, their conduct was unlikely to change in the foreseeable future, and the children's physical, mental, and emotional needs were best met by termination of Mother's and Father's parental rights.

The court's journal entry cited the following statutory provisions in support of its conclusion: K.S.A. 38-2269(b)(2) ("conduct toward a child of a physically, emotionally or sexually cruel or abusive nature"); K.S.A. 38-2269(b)(4) ("physical, mental or emotional abuse or neglect or sexual abuse of a child"); K.S.A. 38-2269(b)(7) ("failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family"); K.S.A. 38-2269(b)(8) ("lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child"); K.S.A. 38-2269(c)(2) ("failure to maintain regular visitation, contact or communication with the child or with the custodian of the child"); K.S.A. 38-2269(c)(3) ("failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home").

8

Father timely appeals.

LEGAL ANALYSIS

*There is clear and convincing evidence to support the district court's conclusion that Father is unfit, his conduct is unlikely to change in the foreseeable future, and it is in the children's best interests for Father's parental rights to be terminated.*

On appeal, Father argues the district court erred in its unfitness and foreseeable future findings because he completed his assigned reintegration tasks except for family therapy. Father contends the fault for his inability to participate in treatment lies at the feet of the agencies assigned to the case because they were charged with the responsibility of rehabilitating the family but failed to put forth reasonable efforts to accomplish that goal. The State replies that Father was not allowed to participate in family therapy because, in the professional opinion of the children's therapists, counseling would be useless until Father acknowledged the sexual abuse occurred.

*Standard of Review*

A district court's termination of parental rights will be upheld if, after reviewing all the evidence in the light most favorable to the State (as the prevailing party), a reviewing court deems the district court's findings of fact to be highly probable, supported by clear and convincing evidence. *In re E.L.*, 61 Kan. App. 2d 311, 322, 502 P.3d 1049 (2021) (citing *In re B.D.-Y.*, 286 Kan. 686, 695-96, 187 P.3d 594 [2008]). This court may not "reweigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact." *In re L.B.*, 42 Kan. App. 2d 837, 844, 217 P.3d 1004 (2009).

*Legal Framework*

Parents have a constitutionally recognized fundamental right to a parental relationship with their children. *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S.

9

Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. at 697-98. In Kansas, "when a child has been adjudicated as a child in need of care, a district court may terminate parental rights only upon findings of both present and foreseeable future unfitness." *In re E.L.*, 61 Kan. App. 2d at 323 (citing K.S.A. 2020 Supp. 38-2269[a]). A finding of unfitness must be supported by clear and convincing evidence. K.S.A. 38-2269(a); *Santosky*, 455 U.S. at 769-70; *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014). "Evidence is clear and convincing if it is 'sufficient to establish that the truth of the facts asserted is "highly probable."'" *In re E.L.*, 61 Kan. App. 2d at 322 (quoting *In re B.D.-Y.*, 286 Kan. at 695-96).

K.S.A. 38-2269(b) provides nine nonexclusive factors for the district court to consider when determining parental unfitness. Additionally, K.S.A. 38-2269(c) lists four additional nonexclusive factors for it to weigh if the parent does not have physical custody of the child. K.S.A. 38-2269(f) states that "[t]he existence of any one of the above factors" in section (b) or (c) "standing alone may, but does not necessarily, establish grounds for termination of parental rights." That is, when a district court bases its unfitness determination on multiple statutory factors, this court may affirm that finding based on any single factor. See *In re E.L.*, 61 Kan. App. 2d at 323.

*The record reflects by clear and convincing evidence that Father was unfit.*

Father conducts his analysis of the district court's decision by walking through each reintegration goal and offering counterpoints to demonstrate how each was fulfilled.

His arguments to us are a thinly veiled request to reweigh the extensive amount of evidence offered by the State in support of its belief that termination of his parental rights was warranted. We must reject Father's invitation to do so. See *In re B.D.-Y.*, 286 Kan at 705 (In both criminal and civil cases, the appellate court does not weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact.).

Although the district court found Father was unfit based on the existence of several statutory factors, the record bears out that the prevailing factor was his awareness of but refusal to admit that N.W. repeatedly engaged in sex acts with his younger sisters. See K.S.A. 38-2269(b)(2) ("conduct toward a child of a physically, emotionally or sexually cruel or abusive nature"); K.S.A. 38-2269(b)(4) ("physical, mental or emotional abuse or neglect or sexual abuse of a child"). Similarly, this fact also resulted in a failure of reasonable efforts by the appropriate agencies to rehabilitate the family because the necessary counseling could not be obtained due to Father's lack of acknowledgment of the abuse. See K.S.A. 38-2269(b)(7). The district court also found a lack of effort by Father to adjust his circumstances, conduct, or conditions to meet the children's needs. See K.S.A. 38-2269(b)(8).

The evidence shows the State was first alerted to a possible threat to the children's well-being based on allegations of physical abuse. But as the investigation into those claims unfolded and details emerged related to the true extent of the unsettling behavior in the home, a pervasive element of sexual abuse emerged. Of greater concern as the case evolved was Father's refusal to admit the abuse occurred. He held firm to that denial despite unequivocal statements from each of the three children that they disclosed the sexual acts to Father and he even witnessed it on one occasion. For example, the court heard testimony from the girls' therapist, Amie Mueller, who shared R.W.'s statements that N.W. frequently subjected her and her sister to sexual intercourse and occasionally allowed a neighbor boy to do the same. R.W. told her parents but they silenced her and, not surprisingly, the abuse continued. A.W.'s account to Mueller largely mirrored that of her sister and was accompanied by a demonstration with dolls to illustrate precisely what acts she endured that Father refused to address. N.W. acknowledged that he sexually violated his sisters in the manner they described and corroborated their assertions that Father was aware of his actions and did nothing to stop it.

11

The district court also heard evidence that Father was notified at the outset of the case that he needed to complete a mental health assessment to determine whether he required therapeutic services to properly address the sexual abuse issue. But according to the case workers' testimony, Father avoided the assessment for several months. Bryan Richardson, the therapist who ultimately performed the evaluation, testified that Father denied any abuse occurred and as a result, no criteria existed for which Richardson could formulate a diagnosis and possible corresponding treatment plan.

Viewing the evidence in a light favoring the State, as the prevailing party, we are satisfied it clearly and convincingly shows that the sisters frequently suffered sexual abuse at the hands of their brother and that Father was aware of the inappropriate conduct yet did nothing. We likewise share the district court's opinion that but for the State's intervention the abuse likely would have continued.

The district court heard testimony that the girls did not feel safe at home, believed the abuse would resume and Father would continue to turn a blind eye if they returned home, and they lacked any desire to continue to live with Father. Notably, the court also heard evidence that N.W.'s sexually inappropriate behavior persisted after he was removed from the home in this case given that he violated another, unrelated, young child.

The priority in this matter is for A.W. and R.W. to feel safe and protected in their family home. As long as Father remains unwilling or unable to acknowledge the reality of the abuse, a safe home environment for the children does not exist. Stated another way, Father failed to put forth the required effort to adjust his circumstances, conduct, or conditions to meet the children's needs. We recognize Father did not personally perpetrate the sexual abuse but find that does not insulate him from accountability and we draw support for that conclusion from *In re S.D.*, 41 Kan. App. 2d 780, 204 P.3d 1182 (2009). This court encountered a similar issue in that case when the mother, whose

12

parental rights were terminated, argued on appeal that K.S.A. 2008 Supp. 38-2269(b)(2) required actual participation in physical abuse and that the mere failure to protect a child from abuse cannot satisfy that factor. The court rejected this argument following an analysis of the statutory language. It explained:  "The ordinary meaning of the phrase 'abusive nature' as opposed to the term 'abuse' plainly evidences the intent to cover abusive conduct other than actual direct physical abuse." 41 Kan. App. 2d at 789. The court concluded "a parent's failure to protect their child from abuse constitutes 'conduct toward a child of a physically, emotionally or sexually cruel or abusive nature' under" the statute. 41 Kan. App. 2d at 789. Viewing the evidence offered during the termination hearing here alongside this authority leaves us satisfied that there is clear and convincing evidence to support the district court's unfitness finding.

> *There is clear and convincing evidence to support the district court's conclusion that Father's unfitness was unlikely to change in the foreseeable future.*

To terminate a parent's rights, the State must show that the parent is not only currently unfit, but that there is clear and convincing evidence such unfitness is "unlikely to change in the foreseeable future." K.S.A. 38-2269(a); *In re E.L.*, 61 Kan. App. 2d at 323. A parent's past behavior is relevant in predicting a parent's future behavior. *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982). The foreseeable future must be viewed from the perspective of a child, because "a child deserves to have some final resolution within a time frame that is appropriate from that child's sense of time." *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237 (2008).

To begin, Father fails to advance a specific, independent challenge that the district court erred in finding that his conduct was unlikely to change in the foreseeable future. The only reference to that step of the equation appears in his issue statement and recitation of our standard of review. While we could summarily affirm the district court's findings for this factor based on Father's failure to adequately brief it, we choose to

13

address this point on its merits because of the importance of the issues at stake. See *In re Marriage of Williams*, 307 Kan. 960, 977, 417 P.3d 1033 (2018) (we consider issues not adequately briefed to be waived or abandoned).

The district court arrived at its conclusion about Father's future conduct based, in some measure, on the large number of prior DCF cases related to the family, two of which involved sexual abuse claims, as outlined in the CINC petitions filed here. As summarized above, the record is also clear that Father continuously denied knowledge of the sexual conduct between N.W. and his sisters, even when informed, and that the children's testimony was consistent and unwavering. Collectively, this evidence suggests Father was aware of the abuse for a considerable period of time and refused to acknowledge its existence even after his children were removed from the home. We therefore find that clear and convincing evidence supports the district court's conclusion that Father's unfitness was unlikely to change in the foreseeable future.

DCF took custody of the three children because of persistent sexual abuse the oldest of the three perpetrated against his sisters. Throughout the case, Father consistently denied the abuse occurred despite compelling evidence in the form of the children's assertions that it occurred with great frequency and that he was notified of the same. His denials created a roadblock for rehabilitation of the family, yet Father refused to relent. Thus, Father's refusal to acknowledge the abuse occurred constituted clear and convincing evidence that he was currently, and in the foreseeable future, unfit to parent the children and it was in their best interests for the district court to terminate Father's parental rights.

Affirmed.